## GEORGE HAISS MFG. CO., Inc., v. LINK BELT CO.

### No. 5549.

District Court, E. D. Pennsylvania.

April 1, 1930.

R. M. Barr, of Philadelphia, Pa. (Henry D. Williams and Howard M. Morse, both of New York City, of counsel), for plaintiff.

C. H. Howson, of Philadelphia, Pa. (Samuel E. Darby, of New York City, of counsel), for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity based on alleged infringement of re-issue patent No. 15,515, re-issued January 2, 1923, to George Haiss, for a wagon loader, designed to move forward bodily into the material upon which it is working, means being provided to dig the material and feed it laterally into the path of the buckets of an elevating conveyor, which in turn dump it into wagons placed behind the machine.

The same patent was involved in another and earlier suit between the same parties (herein referred to as "the first suit") in which, after trial, the District Court for the Eastern District of Pennsylvania dismissed the bill, holding that claims 8 and 9, the only

claims in issue, were invalid in view of the prior art. 27 F.(2d) 397. On appeal the District Court was reversed by the Circuit Court of Appeals and claims 8 and 9 were held to be valid and infringed. 31 F.(2d) 432.

The bill in the present suit was filed December 13, 1929. The infringement alleged is the sale by the defendant of wagon loaders having a new type of feeder somewhat different from the infringing structure of the first suit. The defenses are (a) invalidity, by reason of anticipation, want of patentable novelty and invention, and (b) noninfringement. These defenses will be taken up separately.

To establish invalidity the defendant has introduced into evidence German patent, No. 37,496, to Vollhering & Bernhardt issued 1886, which it contends is a complete anticipation of the Haiss re-issue patent in suit. At the outset we meet the question, whether the defendant is estopped by the application of the doctrine of res adjudicata to contest the validity of the patent. That depends upon whether the order of the Circuit Court of Appeals in the first suit was a final determination of the suit. The order vacated the decree of the District Court and remanded the case with instructions to enter a decree adjudging claims 8 and 9 valid and infringed. A decree in accordance with the mandate was entered by the District Court, the decree including the usual reference to a master to ascertain profits and damages. In Harmon v. Struthers (C. C.) 48 F. 260, it was held that a decree for the plaintiffs in a patent suit awarding an injunction and an accounting with a reference to a master was interlocutory only and did not, in a second suit based upon a different alleged infringing device, preclude inquiry into the validity of the patent. That case is not precisely on all fours with the instant case because there had been no appeal to the Circuit Court of Appeals, but in Australian Knitting Company v. Gormly (C. C.) 138 F. 92, almost the exact situation here presented was before the court, and it was held that the decree of the lower court sustaining the patent, awarding a permanent injunction, and referring the case to a master for an accounting was interlocutory merely and not conclusive of the validity of the patent in a subsequent suit between the same parties prior to the rendition of the final decree in the first case, although on an appeal from such interlocutory decree it had been affirmed by the Circuit Court of Appeals. The only distinction between that case and the instant one is that there the Circuit Court of Appeals affirmed a decree sustaining the patent, while here it reversed a decree invalidating it. Whether a distinction can be drawn between the case just cited and the instant case, and whether or not, in what appears to be a conflict of authority, the rule of the cases cited is the better one, are questions with which we need not be too greatly concerned because there is another element in the situation here presented which puts it beyond question that even the fundamental issue of validity of the patent has not as yet been finally disposed of in the first case.

On February 1, 1930, in the first suit, the defendant presented to the Circuit Court of Appeals a petition based on affidavits praying that the case be reopened for the purpose of taking further proofs with regard to German patent 37,946, referred to above, that the defendant be allowed to amend its answer and set up such patent as an anticipation, and that the Circuit Court of Appeals review the case in the light of the German patent and consider and pass upon the same as to its effect as an anticipation. The affidavits set forth at length the reasons why the German patent had not been discovered and pleaded in the prior course of the suit. The Circuit Court of Appeals on January 21, 1930, made the following order: "The defendant's petition for leave to file a bill in the nature of a bill of review is granted, without expression of opinion as to the merits of said petition, to the extent that the District Court is authorized to entertain a motion by the Defendant for leave to file a bill in the nature of a bill of review and to decide the same." The practice upon applications of this nature is carefully laid down in National Brake & Electric Co. v. Christensen, 254 U. S. 425, 41 S. Ct. 154, 156, 65 L. Ed. 341. "Such applications," said the Supreme Court, "are addressed to the sound discretion of the appellate tribunal, and should be decided upon considerations addressed to the materiality of the new matter and diligence in its presentation. * * * In our view the proper practice in matters of this sort required the Circuit Court of Appeals to regard the petition, * * * as an application for leave to file in the District Court a petition in the nature of a bill of review invoking a consideration of the effect of the judgment in the Third Circuit. Such consideration the Circuit Court of Appeals may well be directed to undertake in the exercise of its proper function in determining the rights of the parties. * * *" Whether, in view of the practice as thus set forth, it is to be assumed that the order of the

Circuit Court of Appeals, 258 F. 880, was made upon considerations addressed to the materiality of the new matter and diligence in its presentation, and involved a determination that the new matter is material and presented with due diligence, or whether it was intended to refer the whole matter to the District Court, reserving the final consideration of all questions including diligence and materiality of the evidence for itself when the record again reaches it, is immaterial. In either case it is obvious that there has not been a final disposition of the first case, even upon the question of validity. This court must, therefore, in this case consider whether or not the German patent is an anticipation of the Haiss re-issue.

In order to get an understanding of the general purpose of the German patent, we read the claim in connection with the statements of the specification. The claim is for "the combination of a container A, lying under water, with a dredger B.C.C., into a combined floating vessel, for the purpose of making possible the use of flap-bottom barges, for the transportation, by means of machines, of the dredged material." In prior dredging operations, says the specification, in which the dredged material was to be transferred from the scows to the land, the scows had to lie alongside the elevator or transferring machine until they were emptied by it. The patent provides for a device by which scows (made with flap bottoms) could dump their contents into under-water containers and promptly depart, leaving the containers to be emptied by the bucket elevator as an independent operation. Scows can thus be kept in continuous use in connection with the deep-water dredging operation, while the material is being transferred from the containers to the land. The problem to which the patent is addressed and the major instrumentalities for its solution are thus clearly apparent.

Turning to the disclosure of the specifications and drawings, we find that the drawings present two quite different exemplifications. Fig. 2 shows the material dumped into a pit close to the shore and a boat provided with a well through which an ordinary chain and bucket elevator may be lowered till it rests upon the material in the pit and then operated as a dredge, the lower bucket line descending and scooping up the material as it turns on the head shaft or head sprockets, and the buckets then ascending on the upper line and dumping the material at the top. There is considerable doubt as to just what Fig. 2 was intended to represent in connection with the patent. I cannot agree with the plaintiff's expert that it was intended to show a prior art operation. While it is not specifically so indicated, I think that it is clear that the pit is intended to be artificially lined, and, if it is borne in mind that the claim of the patent is for a combination of container and dredge, it seems probable that Fig. 2 is intended simply to show the use of the containers with one well-known type of boat and dredge. It is to be particularly observed that Fig. 2 does not show any paddles or other device whereby the material is fed laterally toward the bucket line, and it may be that the trough or container, in this type of construction, was to be emptied by warping the elevator boat along the shore from one end to the other. However that may be, there is absolutely nothing in the disclosure of Fig. 2 which anticipates or even suggests the feeding device of the Haiss patent. Nor do I think it is intended to show an alternative method of operating the device shown in Fig. 3, and I conclude that it may be safely eliminated from further consideration upon the issues involved here.

The disclosure of Fig. 3 in connection with the specification, however, is a different matter. In Fig. 3 the container, instead of resting upon the bottom (or, perhaps, consisting of a pit dug in the bottom), forms an underwater trough, connecting two floating sections of the elevator boat. There is thus formed, between the sections of the boat, a channel the bottom of which is the container, through which channel the scows may pass, stopping on the way to open their bottoms and dump their contents into the container. The elevator apparatus is fixed to one section of the boat and the bucket chain descends into the container. Of course the container cannot be emptied from one end to another by warping the boat (as it can be in the device shown in Fig. 2), because when the boat is moved the elevator goes with it. Nor in all probability would it be feasible to put the elevator upon a pivot and swing it, for its path would then be circular. There is therefore included in this form of device a feeding apparatus by which the material can be moved laterally from each side toward the point where the bucket chain can scoop it up. This feeding device is described in the specification as follows:

"In the present apparatus this (carrying the material lying at both sides of the bucket chain to the same) occurs by means of two prolongations of the lower 'Turas' axis provided with spirally arranged paddles E, which are set in rotation by the bucket chain with the 'Turas' itself.

"The paddles have, on the one side right thread, and on the other side left thread, corresponding to the direction of transport and rotation, so that they move the material along from both sides toward the center of the container, therefore to the bucket chain."

This is a pretty accurate description of the feeding mechanism of the Haiss patent. Is the structure so described an anticipation? To answer this question we must know exactly what the inventive concept of the Haiss patent is. Fortunately the opinion of the Circuit Court of Appeals has pointed it out with precision and clarity.

The functional advance which Haiss made (the Circuit Court of Appeals held) was in making the loader automatically self-shoveling. The opinion points out that the structures by which this function was accomplished were feed paddles on the shaft, adapted to *dig*, and so angularly inclined as to *throw* the dug and loosened dirt, etc., in front of the conveyor. Again, after stating that pushing the material along a trough by a spiral was common practice, the court said that prior to Haiss no one had thought of mechanically *digging the material and throwing it upwardly and laterally into the pathway* of the buckets of the advance conveyor. "In view of the merit of *that contribution* * * * we are of opinion the change was inventive." Claim 8 calls for means for rotating the shaft in such a direction as to exert upwardly directed impacts upon the material. Claim 9 calls for means for rotating the side shaft whereby said blades are caused to deliver a succession of blows to the material and move the same forwardly, etc. Of course a mere function, as such, is not patentable. What Haiss invented was a machine capable of performing the specific functions referred to.

The question thus is narrowed to this: "Does the German patent disclose a structure capable of *digging* material?" In view of the prior art, which (except for the German patent) was before the Circuit Court of Appeals, that word must be given its most restricted meaning, namely, digging exactly as a shovel digs, striking the material a series of pronounced impacts sufficient to cut into it and throwing it upwardly. There is, of course, a striking similarity between the structures, but no matter how much a prior structure may superficially resemble a later one, if it cannot do the work of the later one without inventive modification it does not anticipate.

Now, obviously, so long as the German feeding mechanism is used in connection with the major purpose of the patent it does not work in the manner which the Circuit Court of Appeals has said constituted the functional advance of the Haiss patent. For one thing, it would have to be operated a great deal more slowly. The material by reason of its immersion is much more easily disturbed. The object is not to cut or dig into anything. In fact, the violent impacts of the Haiss machine with their upward direction would be apt to be objectionable by reason of the commotion in the water and conflicting currents which would be set up. As the German feeder was intended by its inventor to be used, its whole process is a pushing or conveying operation.

But this does not dispose of the question. The mere fact that an inventor did not foresee and claim all the uses to which his invention could be put does not prevent it from anticipating its use in an art so nearly analogous to the former one that the application of the device to the new use would occur to a person of ordinary mechanical skill. Dredging under water and digging on dry land are certainly very closely related, and we are thus forced to meet what is really the ultimate question, namely: If you take the German patent and put it to work on a pile of sand or other material on dry land, would it function in the same manner as the Haiss patent?

It certainly would not if rotated in the direction indicated in the patent. The impacts of the Haiss paddles are upward and forward. The machine attacks the material at its near side at the bottom of the pile. As the German patent is operated the impacts are downward and backward. The bucket chain operates in the opposite direction. The machine could not be moved forward into the bank. It may be literally accurate to say that as it works it advances in the direction of the material but its functional relationship to the material is quite different from that in the Haiss patent. It would have to be placed there on the far side or on the top of a pile of material. I do not see how it could possibly successfully attack a bank of virgin earth or anything other than a comparatively small pile of material. These differences, of course, all arise from the different directions in which the shafts and bucket chains of the two machines are rotated. Haiss has taken the German patent, reversed it, and put it to work on dry land.

It must be confessed that the margin of inventive advance is an extremely narrow one. However, after a careful consideration of the major purpose of the German patent and the conditions under which it was intended to op-

erate, I am of the opinion that Haiss' accomplishment is true invention and I so hold. Haiss invented a machine which he could take to the material to be loaded, wherever it lay, in whatever quantities, and in whatever forms. He could dig or cut through a solid bank of earth provided it was not too hard or stony. Now he was accomplishing this only by establishing a distinctly new functional relationship between the blades of his digging device and the material to be attacked. The reversal of direction produced a digging machine in its true sense, and permitted the machine to advance into the material as it dug to a practically unlimited distance and in any direction. The most that the German patent could accomplish was to scoop up and load piled material advantageously placed for it to work upon. The conclusion is that the German patent does not anticipate, and the Haiss patent is valid.

This brings us to the question of infringement. Since the issuance of the injunction in the first suit, the defendant has made two types of a feeding device which for convenience may be called a continuous ribbon feeder and a sectional ribbon feeder, respectively. It is conceded that the continuous ribbon feeder does not infringe and we are not concerned with it. The sectional ribbon feeder, as its name implies, is made in sections, some of the sections being carried by arms which are secured to the foot shaft while intermediate sections are bolted at their ends to the adjacent ends of the arm-carried sections. The abutting ends of the arm-carried and intermediate sections are formed with outwardly projecting flanges, and the sections are assembled and held in continuous spiral relation by bolts solidly and rigidly connecting the two flanges. The outer or forward edge of the spiral so formed carries a heavily notched or toothed flange at right angles to the plane of the spiral ribbon itself.

The machine is shipped to the customers "knocked down," to be assembled by them. The defendant's contentions are: (1) That the structure as assembled infringes by reason of the teeth; (2) that the manufacture and sale of the structure is contributory infringement because the customer in setting it up can omit the intermediate sections (which are to be bolted between the arm-carried sections) and thus get a structure which is practically a paddle feeder of the Haiss type.

I do not think that the structure as assembled infringes. The teeth, in my judgment, cannot possibly accomplish the tossing or throwing function of the paddles in the Haiss machine. I have observed motion pictures of the Haiss machine and the defendant's assembled structure at work, and it is quite evident that the defendant's structure operates in approximately the same manner as the continuous ribbon type without the teeth. The teeth are probably effective to cut into obstructions such as roots, etc., and they may also operate to break up the material more thoroughly, but the whole operation is a pushing or conveying rather than a digging or shoveling one and the impacts delivered by the teeth totally lack the characteristics of the work done by the paddles.

On the issue of contributory infringement the first question is whether the machine if set up without the intermediate sections would perform the functions of the Haiss paddle feeders. I believe that it would, and so hold. The plaintiff's experts testified that it would. The defendant's experts testified that it would not. On the other hand, an inspection of the machine leaves no doubt that with those sections removed the structure would very closely approximate the Haiss paddle feeder. The defendant refused to exhibit the machine in operation with the intermediate sections removed. He may have been entirely within his rights in doing so and I have endeavored not to draw any unfavorable conclusions from his refusal. All I can do is to take the evidence in connection with my impression derived from an inspection of the machine itself. The thought still remains that if I have drawn a wrong conclusion from this it was within the defendant's power to remove it by an exhibition of the machine in action without the intermediate sections of the ribbon.

But the charge here is contributory infringement. The burden of proof is upon the plaintiff. All that his evidence has established is that the parts as sold by the defendant to its customers may be assembled by the customers in a manner which will infringe. He has not shown that a single machine was ever set up in that fashion. He had not shown that the defendant intended it so to be, nor that the defendant had any reasonable grounds to expect it so to be. The mere sale of parts which are capable of being turned into an infringing article does not constitute infringement. In Brinkman v. Laurette Mfg. Co. (D. C.) 21 F.(2d) 607, the patent was for a hat with a double brim. An essential element of the invention was that the two brims were separate. The defendant sold hats like the patented article except that the brims were stitched together. It would have been perfectly simple for customers to have ripped them apart, but the court

held, however, that the sale of the hats was not infringement.

Upon an issue of the contributory infringement the intent of the alleged infringer is an essential fact to be proved. In General Electric Company v. Sutter, 186 F. 637, 638, the Circuit Court for the Western District of Pennsylvania by Judge Buffington said: "Contributory infringement exists where one knowingly concerts or acts with another in an unlawful invasion of a patentee's rights. If such assistance is given by furnishing an essential part of an infringing combination and the part furnished is adapted to no other than an infringing use, such contribution makes him a contributory infringer. On the other hand, if the part furnished is adapted to other and lawful uses, in addition to infringing uses, then an intent to furnish for infringing use must be established before the furnisher can be held a contributory infringer." The intent is a necessary element. It cannot be found merely from the fact that a part can be made use of in an infringing device. This is all that the plaintiff in this case has proved and it is insufficient. I therefore hold that the defendant does not infringe by the sale of the devices which are the subject of this suit.

Decree for the defendant, with costs.